# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1682

_____

|  |  |  |
|---|---|---|
| Jacobia Twiggs, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| John Selig, Individually and in his | * | |
| Official Capacity as Director of the | * | |
| Department of Human Services; Ron | * | |
| Angel, Individually and in his Official | * | |
| Capacity as DYS Director, | * | |
| | * | |
| Defendants - Appellants. | * | |

_____

Submitted: December 14, 2011
Filed:  June 4, 2012

_____

Before WOLLMAN, MELLOY, and COLLOTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Defendants Ron Angel and John Selig appeal from the district court's denial of summary judgment on the basis of qualified immunity.  Defendants raised this defense against Jacobia Twiggs's claim of gender discrimination, which she brought after being fired for untruthfulness in connection with the release of a youth resident from residential custody.  We reverse the district court, finding Angel and Selig are

entitled to qualified immunity because Twiggs has not established a constitutional violation.

## I

Before her employment was terminated, Twiggs was Intake and Placement Director in the Arkansas Department of Human Services, Division of Youth Services (DYS). Twiggs worked under the supervision of Director of DYS, Ron Angel. John Selig was the Director of the Arkansas Department of Human Services and the ultimate supervisor of all DYS employees. DYS contracted with a company called G4S to provide residential services, including security, counseling treatment, sex-offender treatment, educational services, and other related treatment services for juveniles at the facility.

On May 1, 2009, the department released several youths who had been held in residential custody to community-based treatment, a less restrictive treatment program. One of the youths released, A.T., allegedly committed a murder shortly after his release. After the murder, Angel held a meeting to inquire into the circumstances leading to A.T.'s release. Angel, Twiggs, and three other DYS employees were present at the meeting: Assistant Director for Residential Services Kim Luckett, Serious and Violent Offender Reentry Initiative case coordinator Tommy Branch, and Assistant Director for Community-Based Services Elbert Grimes. Angel asked the employees present whether anyone knew whether the G4S treatment team had voiced concerns about A.T. prior to his release. Every employee Angel asked answered that they knew of no concerns about A.T. prior to the release.

Immediately after this meeting, Tommy Branch approached Angel and said that he and Twiggs had been aware of concerns about A.T. before his release. Branch told Angel that a G4S worker specifically voiced concerns about A.T. when Branch was

getting paperwork signed for the release and that Branch had relayed these concerns to Twiggs.

After Branch's confession, Angel met with witnesses and collected statements from DYS and G4S workers. In the course of this investigation, Angel obtained a release summary for A.T. that contained a document electronically signed by Twiggs the night before A.T.'s release. This document showed information from G4S recommending against A.T.'s release. Angel also interviewed Twiggs, who again denied having knowledge of concerns about A.T. prior to his release. Angel consequently determined that Twiggs had been untruthful with him on multiple occasions. In contrast, he determined that although Branch lied during the meeting, he corrected himself immediately after the meeting, and that Luckett, Grimes, and Walker had not been untruthful during the meeting. Consequently, Angel decided not to discipline those employees. After making these determinations, Angel met with several of his superiors, including Selig, and briefed them on the results of his investigation and the conclusions he had drawn from it. Those present discussed options for disciplining Twiggs.

On July 23, 2009, Angel met with Twiggs and informed her of the results of his investigation and his conclusion that Twiggs had lied about her knowledge of concerns about A.T. prior to his release. During that meeting, he gave Twiggs a letter informing her that he was considering disciplinary action against her and giving her an opportunity to provide him with rebuttal or extenuating factors.

Angel and Twiggs met again four days later, and Twiggs again denied that she had knowledge of concerns about A.T. prior to his release. After that meeting, Angel again met with Selig and several other supervisors and discussed options regarding Twiggs's further employment. Angel ultimately decided to terminate Twiggs's employment because he could no longer trust her. Selig approved this decision. On April 30, 2009, Angel presented Twiggs with a termination letter, effective August

14, setting out the specific policy violations he concluded Twiggs had committed, most importantly his conclusion that Twiggs had been dishonest with him.

Twiggs subsequently brought this gender discrimination action under Title VII and 42 U.S.C. § 1983, alleging, *inter alia*, that Selig and Angel, in their individual and official capacities, discriminated against her on the basis of gender when they terminated her employment.[1] Selig and Angel moved for summary judgment, arguing that (1) Twiggs could not establish a prima facie case of gender discrimination, and even if she could, she could not show the legitimate, nondiscriminatory rationale for her termination was pretextual; and (2) even if Twiggs could show a constitutional violation, Selig and Angel were entitled to qualified immunity in their individual capacities.

The district court denied both Angel's and Selig's motions to dismiss, holding that "a reasonable juror could conclude that gender was a motivating factor in the department's decision." For support the district court noted a "slight variation" between the reasons for termination given to Twiggs and those stated in a newspaper article, the fact that Twiggs was the only female involved in the A.T. case[2] and also the only person terminated, that Angel's investigation "seemed to focus on her almost immediately," and that "[t]he department's policy says that no lying, period, and yet there were at least three people, I think, that should have said more than they did in the meeting, at least the July 16th meeting."

---

[1]Twiggs also originally brought claims under the Equal Pay Act, the federal Constitution's Due Process Clause, and the Arkansas Whistleblower Act. Those claims were all either dismissed or abandoned by Twiggs, and are not part of this present appeal.

[2]All other persons discussed in this opinion are male.

-4-

II

"A defendant may immediately appeal a district court's denial of qualified immunity under the collateral order doctrine." Ottman v. City of Independence, Mo., 341 F.3d 751, 755–56 (8th Cir. 2003). We have jurisdiction in this case because the challenge to the denial of summary judgment "turns on an issue of law." Fields v. Abbott, 652 F.3d 886, 889–90 (8th Cir. 2011) (citation omitted). We review the district court's denial of qualified immunity de novo. Ottman, 341 F.3d at 756.

Plaintiffs may establish a claim of unconstitutional discrimination under Title VII using either direct or circumstantial evidence. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973). Twiggs did not present direct evidence of discrimination, so to survive Angel's summary judgment motion, she must establish gender discrimination through the McDonnell Douglas burden-shifting framework. Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir. 2005), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011). First, Twiggs may establish a presumption of discrimination in her prima facie case by a minimal evidentiary showing that she was treated less favorably than a similarly situated employee not a member of a protected class. Id. Angel and Selig then bear the burden of providing a "non-discriminatory, legitimate justification for [their] conduct, which rebuts the employee's prima facie case." Id. (citation omitted). Once the employer provides this reason, "the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." Id. (citation omitted).

Because we find Twiggs's claim of gender discrimination fails at the pretext stage of this analysis, we assume that she has established her prima facie case. Angel and Selig have provided a non-discriminatory, legitimate reason for firing Twiggs but not Branch: Branch came to Angel of his own volition immediately after the May 19

-5-

meeting and confessed his lie, whereas Twiggs stood by her original, untrue statement over the next several months.

The burden then shifts to Twiggs to show that Angel's and Selig's proffered reason was pretextual, and that they did not fire her because she was untruthful, but rather as a result of gender discrimination.[3] She attempts to do so by arguing that she and Branch were similarly situated in their misconduct, and therefore that Angel's disparate treatment of them was discriminatory. For the purposes of the pretext inquiry, Twiggs was not similarly situated to Branch. At this stage, Twiggs must satisfy a more rigorous standard and show that she and "the individuals used for comparison . . . dealt with the same supervisor, [were] subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Cherry v. Ritenour Sch. Dist., 361 F.3d 474, 479 (8th Cir. 2004) (citation omitted). Under this standard, Twiggs and Branch were not similarly situated. Unlike with Branch, there were no mitigating circumstances for Twiggs's misconduct. Twiggs not only lied to Angel in the initial, May 19 meeting, but continued to lie to him over the next few months as Angel investigated the incident. In contrast, Branch's initial lie was quickly mitigated by his correction of it immediately after the May 19 meeting.

Twiggs also attempts to show that Angel's reasons for firing her were pretextual by pointing to an award for employee of the year that Twiggs had received the year before she was fired, Angel's and DYS's "shifting explanations" of her firing, and DYS's "subjective policies" regarding employees lying. None of these arguments are convincing. First, although "[a] history of positive performance evaluations can be powerful evidence of satisfactory performance," employers "may choose to rely

_____

[3]Twiggs does not make a serious argument that she did not lie about having knowledge about problems with A.T. prior to his release, and in light of the release summary Twiggs signed and statements of other DYS employees, there is no material factual dispute on this point.

on recent performance more heavily than past performance." Erickson v. Farmland Indus., Inc., 271 F.3d 718, 728–29 (8th Cir. 2001). Here, while it is true that Twiggs received a positive performance evaluation from DYS, the specific incidents that led to Twiggs's termination occurred after that evaluation. Angel and DYS were entitled to rely on those events, rather than solely the performance evaluation, in their decision to terminate Twiggs's employment.

Secondly, a substantial change in an employer's legitimate, nondiscriminatory reason for firing an employee may be probative of pretext, but we have been clear that these discrepancies must actually be substantial. See E.E.O.C. v. TransStates Airlines, Inc., 462 F.3d 987, 995 (8th Cir. 2006). Where employers "gave two completely different explanations for their decisions to terminate their employees," such a substantial change is established. Id. (citing Briscoe v. Fred's Dollar Store, Inc., 24 F.3d 1026, 1027–28 (8th Cir. 1994) and E.E.O.C. v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994)). However, where the employer "has not wavered from its one explanation for terminating" the employee, there is no substantial change. TransState Airlines, Inc., 462 F.3d at 995. Here, Twiggs argues that there was a substantial change because of various accounts of her termination in local news reports. However, all explanations of the firing, both to the news media, and to Twiggs herself, revolved around the release of A.T. Thus, any shift in explanation was not substantial.

Finally, Twiggs argues that Angel's and Selig's reliance on a subjective policy on employee lying to justify terminating her employment is evidence of discrimination. While "an employer's asserted reliance on subjective factors . . . is to be closely scrutinized for discriminatory abuse," O'Connor v. Peru State College, 781 F.2d 632, 637–38 (8th Cir. 1986), reliance on such factors by itself is insufficient to establish discrimination. Taylor v. White, 321 F.3d 710, 717 (8th Cir. 2003). Here, there is no evidence Angel, Selig, or DYS used the subjective policy on employee

dishonesty in a discriminatory way, and this policy alone cannot be the basis for Twiggs's claim of discrimination.

Because Twiggs has failed to offer evidence that could convince a reasonable jury that Angel's and DYS's stated reason for firing her was pretext for intentional discrimination, her claim fails as a matter of law, and both Angel and Selig are entitled to qualified immunity.  See Ottman, 341 F.3d at 758.

The judgment of the district court is accordingly reversed.

_____